KATHRYN D. ENSIGN, Respondent, *v.* THE TRAVELERS INSUR-
ANCE COMPANY, HARTFORD, CONNECTICUT, Appellant.

Third Department, September 8, 1920.

Insurance — action to recover on policies of accident insurance —
evidence establishing that insured lost his life in accidental fire.

Action to recover on two policies of accident and health insurance, such
recovery being dependent upon whether the insured was accidentally
burned to death. A human body was found in the ruins of a cottage
owned by the insured after a fire which consumed the entire structure.
The insured was an undertaker by trade, and it is the contention of the
defendant either that he died of a disease or that in order to collect the
insurance he set fire to the cottage after having placed therein the dead
body of another person, and that in fact the corpse which was found in
the ruins was not that of the insured.

Evidence examined, and *held*, that the body found in the ruins was clearly
established to be that of the insured; that a finding that he was accidentally
burned to death was justified, and that a judgment for the plaintiff should
be affirmed.

JOHN M. KELLOGG, P. J., and H. T. KELLOGG, J., dissent, with opinion.

APPEAL by the defendant, The Travelers Insurance Com-
pany, Hartford, Connecticut, from a judgment of the Supreme
Court in favor of the plaintiff, entered in the office of the clerk
of the county of Columbia on the 12th day of November, 1919,
upon the verdict of a jury, and also from an order entered in said
clerk's office on the 11th day of November, 1919, denying
defendant's motion for a new trial made upon the minutes.

*Rosendale, Hessberg, Dugan & Haines* [*P. C. Dugan* of
counsel], for the appellant.

*Mark Duntz* [*John L. Crandell* of counsel], for the respondent.

COCHRANE, J.:

The plaintiff has recovered a judgment for the loss of the
life of her husband, Edwin W. Ensign, on two policies of insur-
ance issued by the defendant. One is an accident and health
policy, the other is an accident policy. The only question
raised by the defendant on this appeal is that Mr. Ensign
is not dead or if dead he did not accidentally die. After a

Third Department, September, 1920.        [Vol. 193.

careful analysis of the evidence I reach the conclusion that it justifies the finding of the jury that he was accidentally burned to death as claimed by the plaintiff.

Mr. Ensign was an undertaker by occupation. He married the plaintiff in the year 1901. They had two children, twin boys, born in the year 1907. In that year he formed a partnership with Mr. Bates under the firm name of Ensign & Bates. The firm purchased an established undertaking business in the city of Hudson, N. Y., and continued to conduct it until the alleged death of Mr. Ensign on December 12, 1918. In the meantime the firm started and conducted an automobile business in connection with the undertaking business. Both partners resided in Hudson during the entire period of the existence of the firm. Mrs. Ensign, the plaintiff, owned a cottage at Lake Charlotte, about twelve miles from Hudson, where the family was accustomed to spend its summers. During the autumn of 1918 the family, or a portion thereof, made occasional week-end trips to the cottage. In the early part of December Mr. Ensign was alone at the cottage for a number of days. He was making some repairs and improvements which included the placing of linoleum on the upper floor and painting the same. Evidence is produced of one or more witnesses who were in the cottage at this time and saw the work which was being accomplished and it is established that he took with him two rolls of linoleum from Hudson to the cottage. It had been his custom at different times to make trips to the cottage and spend some time there alone. While at the cottage on the occasion mentioned he was called home on account of the serious illness of his two boys who had influenza pneumonia, a very prevalent disease at that time. December 12, 1918, was a mild and pleasant winter day. The boys were then convalescing from their illness. Mr. Ensign announced his purpose of going to the cottage to complete the work he had in view and close it for the winter, saying that he might return that night but that if he did not finish his work he would remain there and return the following morning. He left home about two o'clock in the afternoon taking with him a lunch consisting of two sandwiches and a piece of cake. He took with him no money except such as he might ordinarily have carried and no clothing except what he wore, consisting of

ordinary working clothes, a fur-lined overcoat and a cap. He drove to the cottage in an automobile truck owned by the firm as he had done on former occasions. On the road he overtook and invited to ride with him a neighbor, who accepted his invitation and proceeded with him in the truck to the lake. During the afternoon hammering was heard in the cottage. About six o'clock he went to the house of Mr. Wentzel, about 500 feet from the cottage of the plaintiff, and procured permission to keep the truck in his barn during the night. He drained the water from the radiator of the truck after backing it into the barn, which was then locked. About seven o'clock he again returned to the Wentzel home and purchased a quart of milk as he had previously done. From there he telephoned to his partner, Mr. Bates, and sent a message to his wife, the nature of which the defendant did not permit to be disclosed. He remained at the Wentzel house about one hour discussing with the family various topics and manifesting nothing unusual or unnatural in his appearance or demeanor. He left there about eight o'clock, saying that he was going to bed. The testimony of one witness is that he said he was going to the cottage to eat his supper. It probably is immaterial, but if there is any importance in the discrepancy of the testimony the advantage has been given to the plaintiff by the verdict of the jury. About half-past eleven o'clock that night a neighbor passing along the highway discovered the cottage to be in flames. He aroused the Wentzel family. When they and others reached the cottage it was entirely destroyed except one post. In the burning ruins was discovered the body of a man burned beyond recognition. Where the head rested were subsequently found pieces of gold. It is not questioned that the gold was such as might have come from the teeth of Mr. Ensign. Most of his upper teeth were crowned with gold. Underneath where the hips of the body had rested was found a bunch of keys identified as his. It is practically admitted and there can be no question that in the absence of fraud and incendiary fire the body found in the ruins of the cottage was that of the plaintiff's husband. The defense is that he placed a dead body in the cottage and that he started the fire and disappeared. The nucleus of this defense of course is that his business as an undertaker gave him the opportunity to provide

a dead body and with this as a starting point the defendant builds its defense mainly with the testimony of physicians and expert witnesses.

The body was found in the living room of the cottage beside a bed. This bed with other furniture had been brought from the rooms above when Mr. Ensign was making his improvements in these latter rooms. The purpose of bringing the bed downstairs may also have been to sleep in that room which was warmer. The cottage was heated by an old-fashioned wood stove in the living room. Only two fragments of this stove survived the fire and were identified by the plaintiff. The coroner, who was called to the scene of the fire shortly after its occurrence, testified that one of these fragments was found by him near a stone and near the head of the body which according to the evidence was about eleven feet from where the stove was standing. It is admitted that carbon monoxide was present in the dead body. The defendant gave evidence tending to show and claimed that such carbon monoxide did not cause death. That may be admitted. The point is, as bearing on the question of the identity of the body, that it was present; that according to the evidence it is the product of imperfect combustion, and that it is formed by explosion or may itself be explosive. The fragments of the stove above mentioned were introduced in evidence and exhibited to the jury. It is claimed by the plaintiff, and such claim is not controverted by the defendant, that one of these fragments appeared to have " buckled outward," indicating the application of force from within. However that may be, it was a legitimate inference by the jury from the evidence and the jury must, therefore, be deemed to have so found that carbon monoxide was generated in the stove and that an explosion occurred throwing the fragments to the places where they were found and starting the conflagration. It was not incumbent on the plaintiff to prove the origin of the fire for the purpose of identifying the body in question as that of her husband. She may establish such identity by any other evidence at her disposal, but it is very clear that if the accidental origin of the fire has been established to the satisfaction of the jury it disposes of the defense herein because the corner stone of that defense is that the fire had an incendiary origin.

When in addition to the foregoing facts the plaintiff established as she did by uncontroverted evidence that Mr. Ensign was a good husband, a good father, a good business man and a good citizen, she had completely demolished the defense. These attributes are inconsistent with the commission of such a repulsive crime as is here charged. Furthermore, the crime if successfully accomplished and undiscovered obviously involves to the perpetrator consequences of such a serious nature, which suggest themselves to all, as to make the commission of such a crime unthinkable and to discredit the defense in the absence of some adequate motive or reason for the commission of the crime. The diligence of the defendant in this case, properly exercised, has not been rewarded with a particle of evidence explaining the alleged conduct of Mr. Ensign which, except for some such explanation or motive, is unnatural and contrary to human experience.

The plaintiff's case does not rest here. The defendant availed itself of its right under the policies to make an autopsy of the body of the deceased. It was made for the defendant by Dr. Schultze. The brains, heart, lungs, liver, spleen, kidneys, stomach and intestines of the deceased, except such portion of the latter as was destroyed by the fire, were carefully examined. Clearly after such an examination and inspection of the vital parts of the body the defendant should be able to demonstrate what caused the death of the person in question. That was the purpose of the autopsy. That was the claim of the defendant at the trial and is its claim on this appeal. It contends that the person in question died from influenza pneumonia. Admittedly the person had that disease, but the plaintiff denies that it was the cause of death. At the time when Dr. Schultze made the autopsy he signed a detailed report thereof. That report may safely be assumed to be correct because the autopsy was witnessed and the report verified by five physicians, including Dr. Vaughan, representing the plaintiff. There was a serious inconsistency between the testimony of Dr. Schultze as given at the trial concerning the condition of the lungs and his original report of the autopsy. The report shows that the right lung contained numerous fine yellowish grey nodules, but shows nothing of the kind in respect to the left lung except that it states that the anterior half of

the lower lobe in its lower portion " shows lobulated areas of a yellowish grey color." In his testimony Dr. Schultze represented the yellowish grey nodules as being scattered throughout all of both lungs. The report shows explicitly that the right lung was aerated and that the left lung was aerated " with the exception of the upper third of the lower lobe in its anterior half which is grey and solidified and nonaerated in part. The anterior half of the lower lobe in its lower portion the lung is firmer and shows lobulated areas of a yellowish grey color and very firm." In other words, the report confines the solidification of the lungs entirely to the anterior half of the lower of the three lobes of the left lung and shows that all the rest of that lung and the whole of the right lung were aerated or filled with air. In his testimony Dr. Schultze repeatedly represents the entire portion of both lungs as being solidified. He testifies: "Around the air tubes in the lung, technically called the bronchi, the lung tissue, which is composed of air sacs, was filled with the products of inflammation, and on examination with the naked eye these parts of the lung were solid and contained no air." Again he testified: "All the lung being affected in fact from the air tubes to and including the air sacs." Still further he testified: " The lungs are solidified, hardened by the products of the inflammation in all parts of the lung." On this testimony alone as to the condition of the lungs rests the claim that death was caused by pneumonia. Other physicians called by the defendant based their opinions as to the cause of death entirely on conditions as stated by Dr. Schultze at the trial. Dr. Vaughan personally examined the lungs and agrees to the report of the autopsy as made by Dr. Schultze. It would seem that any competent physician after such an examination could tell whether the pneumonia was sufficient to produce death without the aid of a microscope or chemical analysis. The latter might be useful if there were a controversy as to the existence or nature of the disease. Emphasis is placed by the defendant on a pathological report made by Dr. Symners at the instance of the plaintiff. I find nothing in that report which militates against the position of the plaintiff. Dr. Schultze testified that he took about thirty blocks from the lungs of the deceased for examination and it is argued that he divided those blocks or sections of the lungs

with Dr. Vaughan who delivered all that he received to Dr. Symners. In this particular as in others the testimony of Dr. Schultze is discredited by his report at the autopsy where he says: " Two sections from the right lung lower lobe placed in jar and a section from the upper lobe.  *  *  *  Several pieces of the areas described in left lung were taken for examination." It will be observed that the " areas described in left lung " were the only areas which according to his original report show solidification or hardness. Dr. Vaughan testifies it was these pieces which were divided with him and which he delivered to Dr. Symners and on the portions so delivered by him the report of Dr. Symners was based. But if we assume that the report of the latter applies to the entire portion of both lungs there is absolutely nothing therein indicating death by pneumonia or for that matter any cause of death. It shows the presence of pneumonia and that " many of the bronchioles together with some of the alveoli are filled to the point of distention by polynuclear leucocytes." As explained by Dr. Vaughan, the latter means not pus but pus-forming cells, a reaction to the inflammation, " the productive agency of the body, and the scavenger of the body." Dr. Vaughan testifies there is nothing in Dr. Symners' report showing the cause of death. That testimony was unnecessary. To me it seems apparent without medical interpretation. It is noteworthy also that Dr. McKenna, the defendant's witness, emphasizes the idea that in stating in answer to hypothetical questions that pneumonia caused death he did not base his answer on Dr. Symners' report. Manifestly he found nothing therein to indicate the cause of death. The original report of Dr. Schultze, therefore, shows as before stated solidification or hardness merely in the anterior half of the lower of the three lobes of the left lung and that all the rest of that lung and the whole of the right lung were aerated or filled with air. The pathological report of Dr. Symners shows merely the presence of pneumonia and contains nothing inconsistent with the report of Dr. Schultze even though it be assumed, which is not the fact, that it applies to the entire portion of both lungs. Dr. Schultze, testifying to conditions materially inconsistent with his previous report, says that in his opinion the influenza pneumonia was the cause of death. Dr. Vaughan testified

positively that in his opinion it did not cause death. He says it was localized or not diffused throughout the entire area of the lungs. That is precisely what Dr. Schultze's original report shows, contrary to what he swore to at the trial. Dr. Vaughan also says the pneumonia was resolving or curing, and if it was curing of course it could not produce death. Dr. Vaughan is corroborated by the original report of the autopsy as made by Dr. Schultze and is not contradicted by the pathological report of Dr. Symners. Dr. Schultze is seriously contradicted by his own report. The jury believed Dr. Vaughan. That ends the defense because very clearly if the defendant after the post-mortem examination which was made could not satisfy the jury that the person whose body was found in the fire died as the result of some disease it necessarily followed that he must have been burned to death. So the jury reasoned and such reasoning is logical. After the failure of the defendant to establish any other cause of death it was of little avail to develop theories based on the clotting of the blood and scantiness of the fat around the intestines. Those circumstances may be accounted for as we shall hereafter see, but were it otherwise the jury clearly had a right to disregard them in view of the testimony accepted by them that pneumonia was not the cause of the death and of the inability of the medical men to otherwise account therefor. It would be more satisfactory if Dr. Vaughan had testified that with the influenza pneumonia as found in this individual he could have been actively about as Mr. Ensign was the day he left home and that his illness would not have been noticeable to observers. For this omission, however, the defendant and not the plaintiff is responsible. Questions by the plaintiff designed to develop those facts were excluded on objections by the defendant, which objections brought from the court the ruling: " I think the only question about this is as to whether this individual died from this pneumonia or not." After procuring that ruling the defendant cannot consistently urge that the pneumonia as described by Dr. Vaughan and by Dr. Schultze in his original report would have prevented Mr. Ensign from going to the cottage and performing the acts which he performed that day. A party on appeal will be held to the attitude which he assumed at the trial. (*Hoffman* v. *Lehigh Valley Railroad Company,*

188 App. Div. 414, 418.)   Neither can the defendant urge with much cogency that the jury rejected evidence given by its experts in answer to questions which it would not permit the plaintiff's experts to answer.   The defendant's physicians however, admitted that with ordinary or lobar pneumonia patients might be around without prostration and manifesting no fever.   " It is very hard to keep some of these people in bed," testified Dr. Schultze, speaking of patients with lobar pneumonia.

Here the discussion might naturally conclude.   In the dissenting opinion, however, some facts are stated in such a manner as to render appropriate further discussion concerning the same.   I do not share in the suspicions of the presiding justice.   Neither do I agree with all his statements of facts nor with all the inferences which he draws therefrom.   It is called to our attention that the policies involved in this action are accident policies, one of which provides for a double indemnity for death in certain specified ways, including death in a burning building, and that the other provides for liability only in case of death in certain specified ways, including death in a burning building.   Turning to the policies we find that the first one was both an accident and health policy; that it was issued shortly after Mr. Ensign recovered from an illness " for stone in kidney lasting four weeks; " and that both policies provide elaborate schedules of indemnities not only for death but for various kinds of accidents and for various kinds of injuries and disabilities.   They were both issued in the year 1916, two years or thereabouts before the fire.   The annual premium of the first policy was $80 and of the second $51.   They are such policies as any active man might naturally have taken.   If they had been conceived in fraud it is improbable that the insured would have paid a larger annual premium for a policy which on the consummation of the fraud was expected to produce a much smaller amount than the less expensive policy.   There were a number of other accident policies which are not set forth in the record but they probably contain substantially the same provisions and probably are of the same general nature as the two involved herein.   It is true that in the year 1918 Mr. Ensign materially increased his insurance, but of the total amount of the maximum insurance of $103,250 this defendant

issued $60,000. Of the maximum insurance of $47,000 issued in 1918, $37,000 was payable to Mr. Bates. Of this latter amount $25,000 was issued by this defendant. If, therefore, there was anything unusual, strange or suspicious about these policies the defendant must have known it. It was a party to the contracts which included more than one-half of the total insurance and most of the entire insurance which was payable to Mr. Bates. The evidence discloses three of the defendant's agents at one time at the place of business of Ensign & Bates negotiating some of this insurance in 1918 which is payable to Mr. Bates. It is improbable that the reasons for making the policies payable to him were not disclosed to the defendant's agents or it may be more accurate to say it is improbable that the reasons for doing so were not urged on the firm by such agents. At any rate the defendant was a party to the contracts and was undoubtedly satisfied with the reasons whatever they were. The plaintiff was not a party to the contracts and does not know the reasons. It is too late now when the defendant is called upon to live up to its contracts to urge that they were suspicious, unnatural or unreasonable. It did not so regard them during the time they were sources of income to itself. Of course the amounts and circumstances of these policies were proper evidence as bearing on the question of fraud, but the importance of such evidence was entirely a matter for the consideration of the jury. And when all the facts concerning these policies are fully stated and their true relationship in reference to their environment is set forth the situation presents a different aspect from the situation as presented in the dissenting opinion. An incomplete statement may be as misleading as any other.

It is said that the annual income of Mr. Ensign was $1,300 and that a payment of $5,500 by Mr. Bates to the plaintiff as the executrix of the will of Mr. Ensign " represented the return of any capital originally put in the business by him and one-half of the profits of the business since 1907." As I read the evidence there is no justification for either statement. Mr. Bates when being examined as to whether Mr. Ensign drew from the business any unusual amount just prior to the burning of the cottage, testified that he drew nothing except what each partner was drawing from the business for living

expenses and which at that particular time was $25 a week. I find no evidence as to what either partner had at any time put into the business or drawn therefrom in the nature of profits or otherwise except as stated. The defendant might have proved the facts but for reasons satisfactory to itself it did not desire to do so. The plaintiff likewise might have done the same but she did not need to do so. The uncontradicted evidence is that the business of the firm was very prosperous and not merely " fairly prosperous; " that each year during the eleven years of the existence of the firm the business increased over the preceding year and that the year 1918 was the most prosperous of all. The business could not be said to be even " fairly prosperous " if it yielded each partner only $25 weekly. The credit of Mr. Ensign at the bank was shown to be good. He had some trifling obligations, but they were not urgent and were met promptly and without difficulty by his executrix after his death. The premiums on the policies in which Mr. Bates was interested were paid by the firm and treated as a firm expense. Furthermore, insurance was not a new venture with Mr. Ensign. He had large policies existing at the time of his marriage which subsequently matured and were paid. There is no evidence justifying an inference that he was pecuniarily embarrassed or that it was beyond his ability to pay the annual insurance premiums which he had obligated himself to do. Neither do I find any evidence that Mr. Ensign or his firm never paid an income tax except that Mr. Bates testifies that after the death of Mr. Ensign he paid no income tax on the business of the firm transacted during the year 1918.

Equally unjustifiable is the argument in reference to the height of the body found in the fire. It is conceded that from the length of the femur the height of the man may be ascertained in twenty per cent of cases within three inches approximately and in the remaining eighty per cent of the cases with greater accuracy. The length of the femur in the body in question was forty-nine and one-half centimeters. There was some confusion in computation, but applying the rule in practice for determining the height of a man whose femur is forty-nine and one-half centimeters, Dr. Vaughan finally made his height less than one hundred and eighty-two centimeters which, reduced to feet and inches, is less than six feet, well

within the limits fixed by the witness, the exact height of Mr. Ensign being five feet, nine inches.    There are two and fifty-four one-hundredths centimeters in an inch.    (Webster's Dictionary; Century Dictionary.)    In reducing the centimeters to inches the witness erroneously assumed there were two and one-half centimeters in an inch and in using that divisor an erroneous quotient of more than seventy-two inches was produced.    The height as expressed in centimeters was correct.    Nothing can change the fact that one hundred and eighty-two centimeters are not more but less than seventy-two inches.

I am unable to grasp the mental processes by which it is argued that the body found in the fire had been mutilated to prevent identification.    The hands and feet and portions of the arms and legs had disappeared.    I do not understand there is any evidence indicating that they had been severed from the body and I am unable to comprehend how the hands or feet, particularly without the flesh thereon, in the absence of some abnormality, would have any bearing on the question of identification.    The presence of the brain precludes the argument that the head had been removed.    As I understand the contention in this particular it is that Mr. Ensign selected a body of a male person about his own age, size and height, but without any teeth, and that he subjected the head to some artificial heat independent of the burning building for the purpose of destroying any indications that there were no teeth, and that he procured some gold in quantity and quality such as might simulate the gold in his own teeth and placed it under the head of the body in question and deposited his keys under the body where they would be protected to a large extent from the fire so that they would survive the fire.    The presence of a pan over which, according to the evidence of one witness, the head was lying is seized on as a straw to lend color to this contention.    That argument strikes me as too fantastic for serious consideration.    Aside from the natural difficulties and impracticability of executing such a subtle scheme it implies on the part of the schemer a superhuman omniscience whereby he could determine just how the scheme was going to work out.    How was he to know that the gold and keys would survive the burning building?    But aside from all other considerations the argument ignores entirely the testimony of

three disinterested witnesses that the skull was present when the body was discovered in the ruins of the fire. It was that which drew the attention of the witnesses to the figure of a man. When the autopsy was held fifteen days thereafter the skull had disappeared. The reason for the transformation is found in the testimony of Dr. Schultze, the defendant's witness, as follows: " Q. Well, doctor, bones will burn if they are subjected to sufficient heat, will they not? A. The organic material of the bones will burn up. The unorganic material or ash of the bones will remain. Q. As we speak of burning the hand or foot of a person, if subjected to sufficient heat it will be burned away so it leaves nothing but ashes, will it not? A. Yes, but the ash would show the form of the bone, unless it was subsequently crushed or disintegrated in some way." The disintegration had taken place intermediate the fire and the autopsy. If some person had purposely burned the head by artificial means for the purpose of destroying it he would certainly have seen that it was " disintegrated " before he abandoned his task. That would have been very easy and without doing so the purpose of the burning was incomplete. The defendant produced witnesses from distant cities who had cremated thousands of human bodies after death and who testified that in all those cases the teeth survived the cremation. It is extremely doubtful whether such evidence was competent. A qualified witness may express an opinion in respect to the particular matter under investigation but he cannot on direct examination give specific instances. The party against whom he is called cannot be prepared to meet individual cases. It will be assumed, however, for the purpose of this case that such evidence establishes the opinion of those witnesses that the teeth of the body in question, if there were any, would have survived the fire although they admit that they have had no experience in respect to persons who have met death in burning buildings where the conditions are obviously different from the conditions which exist in the process of cremation. Those witnesses did not and could not know according to their own testimony whether the bodies which were cremated did or did not have teeth. It appears from their own testimony that they assumed without any knowledge on the subject that whenever teeth did not appear after the

Third Department, September, 1920.     [Vol. 193.

cremation none existed before. It is not strange that such evidence did not appeal to the jury. I shall assume, however, that the teeth are the hardest substance in the human body and ordinarily would survive a fire. But it is not difficult to account for the missing teeth in this case. I quote from the testimony of Professor Touceda, the defendant's witness. " Q. What do you say as to whether teeth can be burned so as to destroy their shape by a degree of heat which is sufficient to melt cast iron? A. Well, I think that the shape can be altered considerably, because there is always more or less moisture there, and the gas as generated by the decomposition of the organic matter in the bone, or the moisture, that will generate gas that will disrupt the teeth and they won't be in just the shape they were before. In other words, the answer to that question depends upon the rate that you would heat them. If you heat them slowly this gas would go off without disturbing the shape of the teeth. If you heat them fast it might cause a change. * * * Q. The burning of the teeth, as you have described, they do burn but they crack apart and separate, is that the idea? A. Portions of them burn just like a bone. There is organic matter in teeth, and that portion burns. Q. So that if some portion of the tooth of a human body came in contact with actual live coals of fire some portion of it would actually burn, would it not? A. I think so. Q. And the remainder may crack apart and become fine particles? A. Well, that would depend upon conditions. If it was burned undisturbed it wouldn't; it would retain the form of the tooth as you see in this case here (ind.)." This testimony must be construed in the light of the following facts: that Mr. Ensign had poor teeth; that this body was burned by a roaring mass of flames in the open air; that timbers were repeatedly falling on or about the body; that while still burning the body was subjected to the sudden reaction of eight or ten pails of water thrown upon it to preserve it and extinguish the fire; that after the fire was extinguished the body was handled, wrapped in a blanket, transported twelve miles, part of the distance over a rough road; that it was prepared for burial, buried, and after fifteen days was disinterred and presented at the autopsy; that there were at the autopsy numerous small pieces or fragments of bone which could not be identified. In the light of the fore-

going testimony of Professor Touceda and of the foregoing facts, all of which are established, the jury were at liberty to determine that the absence of the skull and teeth was sufficiently explained. As we have already seen, the disappearance of the skull intermediate the fire and the autopsy was conclusively established. It should be observed also that no witness testified either to the presence or the absence of teeth when the body was discovered at the fire. Probably they at that time escaped identification, but there is no evidence on the point. The entire evidence as to the absence of teeth relates to the time of the autopsy. Even Dr. Schultze admits that the incineration of the head in this case would account for the disappearance of the teeth in time. One of the witnesses testified to the presence of a pan in proximity to the head of the body. His exact testimony was: " It [the head] was over the pan; it wasn't directly in it." No other witness makes any allusion to the pan except that it was present and it does not appear to have been regarded by any one at the time as a suspicious circumstance. There was no cellar under the cottage. The floor was one foot above the ground in addition to the thickness of the sills. Reference has been made to a stone near which one of the fragments of the stove was found. The stone, according to the inference of a witness, which must have been correct, had been under the floor of the cottage which had been built over it. The floor of course was destroyed. Like the stone the pan may have been under the floor. If the body in question was lying on the bed in the living room of the cottage it must have rolled therefrom when the bed tilted with the burning floor. But if a person sleeping in the bed had arisen therefrom and overcome by flames or smoke or gases had fallen to the floor or if, as the defendant claims, a dead body was placed on the floor beside the bed, the body when the floor burned thereunder would have sagged to the ground beneath. The point is that in any event the body when found could not have been in the same position in which it was before the floor burned. The fact that the head was " over the pan," therefore, is of no significance. The walls of the thorax and some of the ribs were burned away, indicating that the body was not lying face downward as would naturally be the case if an attempt had been made to burn away the recognizable fea-

Third Department, September, 1920.    ·    [Vol. 193.

tures of the head. And is it conceivable that a person destroying the head by the method suggested would have left the pan thereunder? He would have reduced the head to ashes and removed the pan before he abandoned his gruesome task. Throughout this controversy it has been assumed that Mr. Ensign if in the burning cottage must have been sleeping on the bed in the living room. Perhaps he was. But such assumption is not required. To facilitate his work in the upper rooms he had moved some of the furniture to the rooms below, including one of the beds. Although he told his wife he had moved the bed to the living room because it was cold, the night in question was not cold, and whether he was sleeping upstairs or downstairs is a question which cannot be determined. There were two beds upstairs. Perhaps it is unimportant except that the jury in deciding this case in favor of the plaintiff were not required to find that he was sleeping in the lower room. It is no more difficult to understand the freakishness of the fire in consuming certain parts of the body more than others than it is to understand its freakishness in the destruction of the building and its contents. Not a single nail was found in the ruins nor any part of the hardware of the building except perhaps the lock and key of one door. Some of the glass, probably from the windows, but not all of it, remained. All cooking utensils disappeared, but a Lincoln penny and a metal badge, a plaything of the children, were subsequently found. The old wood stove in the living room, except two fragments heretofore mentioned, had disappeared and nothing was left of the stove in the kitchen. The iron bed with its springs in the living room retained its identity except that it was warped and blackened, but not a vestige remained of an iron bed which was in the upper room. It is beyond human ingenuity or explanation to account for such apparently inconsistent results. The burning of the body was no more inconsistent. Fire and flood are not logical or consistent in their ravages. Undoubtedly, however, it is a fact that the head of the body was exposed to more intense heat than the rest of the body because it was nearest to the burning side of the building.

Incidentally it is difficult for me to understand why if this was a dishonest fire the bed should have been removed from the

upper to the lower room. I cannot conceive how the criminal purpose, if it was such, was subserved or aided by that change. It would seem to me that from every standpoint a person consummating this alleged wicked plan would naturally have preferred the bed and the body to be in the upper room, the natural place for both. The purpose could better have been accomplished in that part of the house and with a greater appearance of naturalness, and I am unable to perceive how from any standpoint anything was to be gained by placing either the bed or the body in the room below. The fact that the bed was moved is to my mind a strong circumstance against this defense. It may not strike all minds the same way, but certainly it was a circumstance the importance of which was a question for the consideration of the jury.

The empty stomach proves nothing in view of the testimony of Dr. McKenna, the defendant's witness, that it " shows that nothing had been taken in for at least a period of three hours." Naturally the insured had not eaten in three hours before the fire. I do not understand that the evidence establishes that there were no contents in the intestines. Dr. Schultze at the trial substantially so testified except that he admitted that " the small intestine contained very little recognizable content." Experience demonstrates that the original report of the autopsy made by this witness is more reliable than his testimony, and turning to that report which at the time of the autopsy represented the agreement of both parties to the controversy as to what the autopsy disclosed we find the following: " The small intestine is mostly charred, very little of it shows appreciable contents. The caput coli shows its mucous membrane stained with feces, very little contents. The hepatic flexure is charred. The right half transverse colon is collapsed and empty. The spleenic flexure of the colon and descending colon is absent. On the left side of the abdomen over the area of the descending colon the abdominal·wall is absent and its margin in the opening is charred and ragged." Although the report is silent on the point, the testimony shows that a portion of the rectum was absent. With a portion of the intestines missing and what was left showing some contents and a part showing " appreciable contents " it is a

App. Div.— Vol. CXCIII.      25

mistake to say that the intestines were empty or to draw any inference based on the alleged absence of their contents. The testimony shows that Mr. Ensign had eaten very little on the day in question, except that he ate an ordinary breakfast. In respect to the scantiness of fat around the intestines or in the abdominal cavity it would naturally occur to an ordinary layman and doubtless occurred to the jurors that such a roasting as that body received would naturally deplete the fat and reduce it to a minimum. Part of the abdominal walls and part of the intestines were entirely burned away and other portions were charred to an extreme extent. Dr. Schultze testifies that the blood in the case of persons burned to death does not clot. Dr. McKenna, defendant's witness, is not so sure about that. He says it does not " clot as a rule " and that it does not " generally " clot. His theory of the clotting is that it is caused by contact with air and that the inhalation of smoke and gas by victims of fire excludes air from the lungs, but that in the course of time if the body is left to itself the blood will settle by the force of gravity and form clots. In other words, if the victim of a fire inhales smoke or gas the blood clotting process may be retarded or interfered with but is not necessarily prevented especially after the lapse of time. That is the way I understand this testimony and I think that certainly is a fair inference therefrom. All these conditions, the contents of the intestines, the scarcity of fat, and the clotting of the blood, are stated in the report of the autopsy and were known to Dr. Vaughan and agreed to by him when he testified that influenza pneumonia could not have been the cause of death. In respect to all these circumstances it must be remembered that they relate to conditions fifteen days after death and after the body had been embalmed and had necessarily experienced physical and chemical changes by reason of fire and water and lapse of time.

I have not attempted to answer all the arguments advanced or suggested in the dissenting opinion. Some of them seem to me to be trivial and unimportant. Others are based on evidence which the jury had a right to reject. All of them should be addressed to the jury. I think one of the fallacies of that opinion consists in attributing to the expert testimony a conclusiveness to which it is not entitled. Ordinarily such

testimony even though uncontroverted may be disregarded by a jury. (*People ex rel. Third Avenue R. R. Co.* v. *Tax Comrs.*, 212 N. Y. 472, 485; *The Conqueror*, 166 U. S. 110, 131, 133; *Brehm* v. *Great Western Railway Co.*, 34 Barb. 256, 273.)    In *People* v. *Vanderhoof* (71 Mich. 158) the court laid down the wholesome rule that a party is not obliged to employ rebutting experts on pain of having the original evidence of experts accepted as conclusive.    But it is not necessary in the instant case to go to that extent or to seek the application of the rule above stated.    All the evidence of the defendants has been met and controverted.    It may be that in some details there is no direct clash of witnesses against witnesses, but the witnesses of the defendant do clash with the general tenor of the evidence given by other witnesses and in some instances by other witnesses of the defendant.    In this, as in many similar cases, the theory advanced by one expert witness is unconsciously exploded by the theory advanced by another.    There is a clear inconsistency between all the testimony produced by the defendant and other portions of the testimony produced either by the plaintiff or the defendant, and there certainly is a clash between the expert witnesses of the defendant and the circumstances and probabilities disclosed by the evidence.

I do not think what may be called the human aspect of a case like this should be entirely ignored.    The conduct of the insured during the few days preceding the fire should be carefully considered.    The renovation and improvement of the cottage by him as " a surprise to the family in the spring; " the removal of the bed from the upper to the lower part of the house; his anxious solicitude for his sick boys repeatedly and variously manifested; his purchase for one of them of the thrift stamps on the day he left home; his preparation on that day of the meal for the use of the family after his departure; his delivery to his wife when he departed of a small sum of money to purchase family supplies; his invitation to the neighbor to ride with him on his way to the cottage and the usual and ordinary conversation in which they engaged; the message to his wife at about seven o'clock in the evening; his visit of about an hour with the Wentzel family, engaging as he did in ordinary talk with his usual appearance; these and other instances which might be mentioned are not indicative of a man whose mind

is obsessed with a purpose to immediately commit a crime which he knew would necessarily entirely change the status of his life and practically wipe out his existence. It is impossible in an opinion to give a picture of this man's life during the short time preceding the fire, but I do not see how any one can read this record without being convinced that he was thinking the thoughts and doing the deeds of a man impelled by normal and honorable motives. If it be argued that he was acting a part and gauging his conduct to avert suspicion, the answer is that he must have been an extremely good actor to play the part so naturally and with such apparent unconsciousness. But if it be admitted that he may have been dissimulating, it remains a fact that there is no explanation of his crime. A man may desire to abandon his family; he may desire to abandon a business prospering with a continually increasing prosperity; he may desire to abandon friends and social relations and all that he has striven for during a life of nearly fifty years; he may desire to wander a fugitive from justice shrinking in terror from every familiar face or voice; he may even desire to obliterate his identity; all of which is implied by this defense on the part of the insured; but a man never has any of those desires unless there is some good reason or motive therefor. Without such a reason or motive the defense rests on no foundation.

The weakness of the defense is emphasized by the necessity which is recognized in providing an accomplice for Mr. Ensign. The accomplice selected is his partner. As they were partners in business so it is insinuated they are partners in crime. This adds to the improbability of the defense. Not one but two reputable citizens with long and honorable and successful business careers have suddenly become criminals. Mr. Ensign did not need the assistance of his partner to accomplish this crime. The sole connection of Mr. Bates with the transaction consists in pouring water on the burning body when he was summoned to the fire, an act which did not promote but on the contrary retarded it and tended to expose the conspiracy if it existed in which he was himself concerned; or was that also done to avert suspicion? The necessity of an alleged accomplice arises, of course, from the fact that without one Mr. Ensign could not expect to profit to the extent of a single dollar. If such a conspiracy could be successfully accomplished it

would profit Mr. Bates to the extent of his ill-gotten gains, but probably no one will argue that the profits of Mr. Ensign would be a temptation to him to make the great sacrifice he was required to make.   There is small inducement for one to lead such a life as to win the respect and esteem of the community in which he has lived for many years unless it counts for something against an assault of this nature based as it is on not a single probability but on theories and conjectures.   The jury which had the responsibility of deciding this case refused to be misled by such theories and conjectures and followed the path of reason and good sense and common experience.   I have no doubt that it was the duty of the trial justice to submit this case to the jury for their determination and I am equally clear that the verdict should not be set aside as against the weight of evidence.

No ruling during the trial is complained of on this appeal. No objection or question of any kind is raised in criticism of this judgment except that the insured is not dead as the result of an accident.

For all the reasons stated I think the judgment and order should be affirmed, with costs.

All concur, except JOHN M. KELLOGG, P. J., dissenting, with an opinion, in which H. T. KELLOGG, J., concurs.

JOHN M. KELLOGG, P. J. (dissenting):

The plaintiff's cottage, at Lake Charlotte, twelve miles from Hudson, was burned on the night of December 12, 1918, and in the ruins was found the charred trunk of a man.   Recovery has been had upon two accident policies to the plaintiff, upon her husband, one dated July 19, 1916, for $7,500, with a double indemnity for the loss of life in a burning building, a public conveyance or passenger elevator, thus making that policy, as the jury finds, $15,000; the other, dated December 21, 1916, for $20,000, for death by accident while in a burning building, upon a public conveyance or upon a passenger elevator.   The question for consideration is whether the plaintiff's husband met an accidental death in the burning building.

At the time of the fire the total insurance, life and accident, covering Ensign's life, if he met accidental death in a burning building, a public conveyance or a passenger elevator, was $103,250, of which $56,250 was payable to the wife, $5,000 to

the wife and children, $5,000 to the children, and $37,000 to his partner, Bates. Seven of the policies were issued prior. to February 27, 1918, and all of the seven were accident policies except three of $2,000 each, taken out October 13, 1917, with annual payments of $239.88. These seven policies called for $61,250 in case of accidental death in a burning building, a public conveyance or passenger elevator; if accidental death occurred otherwise, the amount payable would be reduced by $35,000. The total annual premiums on these policies was $438.08, including the $239.88 on the life policies of October 13, 1917, or $198.20 if that premium is excluded, and the total annual premium on all policies outstanding at the time of the fire was $2,279.33.

After February 27, 1918, Mr. Ensign was very active in insurance matters. On that date two life policies, together calling for $5,000, were issued, in which the wife was named as beneficiary. The beneficiary was changed July fifteenth to the wife and two children. April 6, 1918, a life policy of $10,000 was issued, his estate being the beneficiary; June twenty-eighth the beneficiary was changed to the partner, Bates. May fourth a joint policy was issued upon the lives of Ensign and Bates for $15,000 for benefit of the survivor. On July sixth an accident policy for $5,000 was issued, payable to Bates, with double indemnity in case of loss in a burning building, a public conveyance or a passenger elevator. On August 16, 1918, a life policy of $5,000 was issued to his estate; on October twenty-fourth the two children were substituted as beneficiaries. On November 20, 1918, he took an accident policy with an indemnity for loss of life during the first year of $2,000, payable to Bates. In all of the life policies issued in 1918 the premium was payable quarterly, and on the policy of August 16, 1918, a note was given for the premium falling due a few days before the fire. Bates testified that the premiums upon the joint policy and upon the $10,000 policy payable to him, or $1,322.60 per year, were payable by the firm. The other premiums clearly were an obligation against Ensign alone. He and Bates were equal partners as undertakers at Hudson, N. Y. It does not appear that there was any policy, accident or life, upon the life of Bates for Ensign's benefit, other than the joint policy mentioned. These policies called

for a payment by Ensign of $966.76 per year in premiums, a large sum to be paid by a man whose annual total income, as we shall see later, was only $1,300, and who had himself, his wife and two children to support. He paid a house servant four dollars per week; her wages and the premiums payable by him would pretty well exhaust his annual income, in addition to which he would be charged the half of the $1,322.60 which Bates says the firm was to pay. The plaintiff knew that the husband had insurance, but did not know of the amount, and had no information that any of it was for the benefit of Bates. The insured was upwards of forty-nine years of age, weighed 190 pounds, was five feet nine inches high, a fairly strong, rugged man, with broad shoulders, well proportioned, and was in good health. The fact that he had so recently been accepted for insurance speaks for his good health. He had spent the morning of the fire in putting double windows upon his house at Hudson. He had lost no teeth; most of his upper teeth, however, were crowned with gold. He, his wife and two children lived over the undertaking office. His family relations were good.

Ensign and Bates had a morgue in the office building and a vault in the cemetery, in each of which were many dead bodies. On account of the influenza there had been many deaths, and both partners had been very busy. Bodies came to the morgue from hospitals; other bodies came from private homes; in some cases the persons who died had no homes; some of them were foreigners. Ensign was the embalmer and had charge of the dead bodies. In one week the firm had thirty funerals. Both partners were men of good standing in the community. Bates had a wife and two children. Each partner drew from the business $25 a week for living expenses. Ensign had no individual property except the little cottage at the lake which had been purchased by him and deeded to the plaintiff. The firm owned the building in which the office was, subject to a mortgage of $4,000. Bates' house was mortgaged for $2,500. The firm, a few months before the fire, as " a side line," had begun the sale of automobiles, and had outstanding notes, business paper, on that account, of $9,000, and it owed $4,700 in other indebtedness, apparently, in addition to the mortgage. Ensign personally owed about $800, which

embraced several notes in the bank due to tradesmen. Some of the tradesmen's notes had been running for some time and had been renewed from time to time with small payments thereon. The firm had been in business since 1907 and was fairly prosperous. Neither Bates, Ensign nor the firm paid any income tax. There is no evidence that either partner ever drew from the firm anything aside from $25 per week, from which it would result that that sum was Ensign's total income. After the fire Bates paid the plaintiff, as Ensign's widow, $5,500, as he says, for Ensign's interest in the business, which of course was subject to the payment of his debts. This represented the return of any capital originally put in the business by him and one-half of the profits of the business since 1907.

The Ensign family lived at the cottage during the summer, up to about Labor Day, and he was frequently there nights. Some time about the latter part of November, 1918, Ensign, it is said, began to make certain repairs upon the cottage and was there several days. Among other things, he removed the furniture from the second floor to the first, put down some linoleum on the second floor and was to paint it two coats; this was intended as a surprise to his family in the spring. He was called suddenly from the cottage on account of the sickness of his children who had the influenza. On the day of the fire the children were better and it was understood that the woman who was assisting in taking care of them would leave the first of the week.

Ensign, the morning of the fire, was cheerful and in his usual good health. He said he would go to the cottage and close it for the winter. His breakfast, at about seven o'clock, consisted of two or three pieces of sausage, five or six pancakes, bread and butter and coffee. His luncheon, about eleven o'clock, consisted of soup, pie, bread and butter and milk. Sandwiches and cake were prepared for him to take to the lake. He went to the lake in the Vim truck in which there was nothing but himself; left the truck at a neighbor's and went to the cottage. Hammering was afterwards heard at the cottage. In the evening, about eight o'clock, he came down to the neighbor's, about 500 feet from the cottage, visited with the family a few moments, telephoned to Bates, at Hudson, that he would be home early in the morning and bought a quart of milk. He

gave a twenty-five-cent piece for the milk and received in change a ten-cent piece and five pennies; he put the change in his pocket and said he would go to the house and eat his supper. At eleven-thirty at night the building burned and he has not been seen alive or heard of since.

When the neighbors arrived upon the scene, the burned body rested upon a bed of coals thicker and higher than was found in other places, and this thickness reached out several inches beyond the body. Both arms, and both legs up to the knee, the skull, the face, the jaws and the teeth were missing. There was attached to the bone of the neck a carbonized mass, about four inches from back to front, four inches from side to side and two and seven-tenths inches in height from the upper bone of the neck. At the autopsy the mass proved to be the brains. It was found in or over a granite milk pan, the neck laying over the edge of the pan. Sometime after the body was removed Ensign's keys were found lying on top of the ashes, apparently about where the hips of the corpse lay. A Lincoln penny lay six feet from the corpse. A constable's metal badge, a plaything of his children, was also found, as well as a substance apparently gold which may have crowned one or two teeth. The gold watch which Ensign wore, and which was upon his person when he left home, could not be discovered, nor could the coins which the neighbor had given him as change. The keys were blackened, but the defendant's expert swears that an examination of them showed that they could not have been through a fire. The ashes and the debris in the vicinity of the body were carefully sifted and examined; the ashes in the pan in which the head lay were also examined. Some pieces of bone, which could not be identified or put together as forming any part of the missing members, were picked up, together with some molten glass and an animal's bone. There was no cellar under the building; it rested on cement or stone posts and was about a foot from the ground. An iron bedstead, with wire springs, which had been brought down from upstairs, stood near the door and the window; the head of the bed was towards the door and within two or three feet of it. The foot of the bed reached out into the room toward the stove. The chimney had fallen inside the room and eight or ten bricks were found near the foot of the bed.

The side of the foot of the bed near the corpse was bent down some, apparently by the fallen brick. The iron pipe of the bed was warped some; the bed and springs were blackened, otherwise were in good condition. The dead body lay near the bed and substantially parallel with it; the head was towards the door. Bates infers that when the corner of the foot of the bed fell down, the body rolled off the bed upon the bed of coals; but inasmuch as the bed was otherwise intact, it would hardly seem that the slight accident to its foot would have dumped the dead body upon the bed of coals.

It will be noticed that the absence of the feet, the legs, the forehead, skull, jaws and teeth, would naturally obliterate not only every ordinary means of identification, but every ordinary means of ascertaining the height of the body in life. The record establishes that where a body is consumed by fire, the teeth and shin bone practically remain intact and, at a crematory, have to be destroyed, after all else has disappeared but ashes, with mortar and pestle. It is seldom that the skull, forehead, jaw bones, legs and arms are missing. They may be weakened by the fire and reduced to such a state that they can be disintegrated, but they keep their shape until force is applied to them. There is no substantial dispute upon this subject. Possibly, of course, the falling debris may have caused more or less disturbance. But the fallen brick were at the foot of the bed, and there is no suggestion that the granite milk pan, in which the head lay, was broken. It would, therefore, seem that the teeth, jaws, skull and bones of the head would naturally be found in the pan. The evidence as to the probable survival of the bones in a fire, after the other material of the body has disappeared, is interesting and convincing.

It is conceded that, with knowledge of the length of the femur, in one or two directions, the height of a man, with reasonable certainty, may be ascertained. The plaintiff's expert says that in fifty per cent of the cases it is correct within a fraction of a centimeter; that in thirty per cent it varies not to exceed an inch and in twenty per cent there may be a variation which will reach, in some cases, to three inches. The length of the femur here is undisputed. Dr. Vaughan, the plaintiff's expert, reckoning from it, gave the height of the dead man as between seventy-one and seventy-two inches, or

five feet eleven inches or six feet, but upon cross-examination, when the computation was challenged and he was informed that the defendant's counsel made it seventy-two inches and a fraction by the same formula, the court asked him to verify the figures. He stated that he used the arbitrary formula of Roulett's rapid method, but conceded that it had not been adopted, meaning I infer that it was not in general use in this country. Upon going over his figures he gave the result as seventy-two and fifty-two one-hundredths inches. The defendant's expert gave the height as seventy-three and three-tenths inches. According to the formulas given by these witnesses, two and one-half centimeters are figured as an inch. If we take the substantially correct ratio, two and fifty-four one-hundredths, Dr. Vaughan's evidence makes the dead man five feet eleven and two-fifths inches and the defendant's figures about six feet and one-fifth inch. The respondent's brief is clearly in error in computing that seventy-one and three hundred and eighty-five one-thousandths inches make five feet and nine and forty-five one-thousandths inches. The height of the deceased precludes to a reasonable certainty the conclusion that he was the insured. The computations being made by both experts from formulas, we are not justified in changing them and in using the two and fifty-four one-hundredths instead of the two and one-half which seems to be a part of the formula, the difference probably being compensated for by the other figures. Dr. Vaughan speaks of his formula as the " rapid method."

The insured, on his former visits to the cottage, had always left this truck near the cottage; this was the only time he left it at Wentzel's. He left the truck at Wentzel's barn at three o'clock and returned there about six o'clock, put it in the barn and drained the water from it. He came back between seven and eight to telephone and get the milk. Upon leaving home Ensign told his wife that he would be back about ten o'clock if he got through his work; if not he would stay there and have a good sleep. When he put his truck in the Wentzel barn at six o'clock, drained it and locked the door, he knew that he was not to return home that night.

Dr. Gettler's report shows the presence of formalin, the base of all embalming fluids, in the kidney and liver. Bates swore

that before the funeral he had thrown an embalming fluid upon the body and with a trocar had jabbed it into various parts of the body. At the autopsy Bates made no suggestion that any embalming fluid had, at any time, been used. Dr. Schultze and two representatives of the company swear that Bates had stated to them that nothing had been done to the corpse and that no embalming fluid had been used. He denies this, but Bates is deeply interested in the litigation. It is urged that his connection with the business, and the practical impossibility of taking a corpse from the morgue or the vault without his knowledge, may explain the large policies in his favor. Dr. Schultze swears that there were no marks of a trocar. Evidently if there had been such marks they would have been noted in the autopsy, it having been made by physicians who represented both sides of the controversy. It is more than probable that an undertaker, bringing a corpse before doctors for an autopsy, would state to them, if such was the fact, that he had embalmed it, and the method thereof. Concededly, Bates made no such statement. His evidence as to putting embalming fluid upon the corpse evidently was suggested by the report of Symners. Whether or not the body was embalmed was a very material question. If a corpse was taken from the morgue or the vault to the cottage, it probably would be one that had been embalmed. The old wood stove in the cottage had some of its plates bulged out and broken but none had melted. That fact is seized upon as a suggestion that the over-heated stove broke open and set the building afire, but it seems incredible, with the head of the bed within two and one-half feet of the door, and with windows near, that any person on the first floor would not have made his escape.

Bates went to the cottage about a week before the fire to get Ensign. The road from the State road to the cottage, about two miles, was a very bad dirt road. As he left the State road and got half way up the hill, he tore a chain from his car and it was so muddy that he left the car there and continued the trip to the lake afoot. On the day of the fire, after Ensign had left Hudson at two o'clock, Bates, about four o'clock, ordered the chauffeur to put chains on the touring car, so as to be ready for a night call. It was a bright, fine day Ensign, on the morning of that day, had the chauffeur repair

the Vim truck so that he could use it. According to Bates' theory, for sometime at least before that day the firm had no conveyance ready for a night call. The car with the chains on it was first used in going to the cottage after the fire.

At the autopsy Dr. Schultze represented the defendant and Dr. Vaughan the plaintiff. There were present several other doctors and others. Dr. Vaughan and Dr. Schultze agree fully as to the accuracy of the report of the autopsy. That report is complete, and shows the condition of the charred body, giving a particular description of the lungs, stomach, heart, kidneys, spleen, liver and pancreas. From the lungs over thirty blocks, varying in size from a half inch square to nearly an inch square in extent, were taken. Dr. Vaughan had a half of each block and he delivered those from the stomach, lungs, kidney, liver and spleen to Dr. Symners, the pathologist of the Bellevue Allied Hospitals, for microscopical examination. Dr. Symners made the examination and his report was a letter written to the plaintiff's attorneys, which we copy:

" GENTLEMEN: Microscopic examination of portions of certain organs submitted to me by Dr. J. C. Vaughan, reveals the following changes:

" Lungs: Many of the bronchioles together with some of the alveoli are filled to the point of distention by polynuclear leucocytes. The most noticeable change in the lungs, however, consists in the presence of an exquisite organizing pneumonia. The process of organization being manifested by a diffuse overgrowth of richly cellular fibroblastic connective tissue. At one point is a rather large thrombosed blood vessel. Some of the alveoli are emphysematous, and in places the interstitial tissues are rich in coal dust. The blood vessels of the pleura are deeply injected.

" Kidney: One part of the kidney shows wide spread necrotic changes. Another part reveals increased cellularity of the Malpighian tufts, together with intense granular degeneration of the lining epithelium of the tubules. The lesion in the better preserved portion of the kidney is that of a subacute productive glomerular nephritis.

" Microscopic examination of the liver, muscle tissue and spleen shows extensive necrotic changes. (Signed) Douglas Symners, Director of Laboratories."

It is idle for Dr. Vaughan to say that the report relates only to a particular section of the lungs. The report was made upon all the sections taken and, in every substantial respect, it agrees upon those subjects with the testimony of Dr. Schultze who made a microscopical examination of all the blocks taken from the organs or other parts. A layman, with an ordinary dictionary, from Dr. Symners' report, can satisfy himself that the corpse was not the well, vigorous, broad-shouldered, rugged Ensign, who weighed 190 pounds. Dr. Schultze makes clear that it would have been impossible for the man to be around performing the acts which Ensign was shown to have performed on the day of the fire, and clearly shows that the man died from acute broncho pneumonia, from influenza.

The report of the autopsy shows a thinness of fat in the several places where fat was found. Dr. Schultze swears that the underlying fat between the muscles of the belly was well preserved, but was very thin and scant, showing that the fat of the man had been consumed in nourishing the body by reason of inability to take food. The plaintiff's expert does not in any way deny or seek to qualify this testimony. It must always be remembered that Dr. Vaughan, the only expert appearing as a witness for the plaintiff, made no microscopical examination, and that he agrees in every respect with the report of the autopsy. The stomach was empty, the small and the large intestines were substantially in the same condition and the colon was completely contracted and empty. These facts, connected with the scantiness of the fat, showed that the man had not been eating much for some time, and are entirely inconsistent with the meals which Ensign ate during the day. As we have seen, Ensign had sandwiches, cake and milk at eight o'clock. There was an absence of carbon and soot in the larger air tubes, but in case of death by conflagration they would be found. The blood was clotted, while in cases of death by conflagration it would remain fluid. The coal dust, spoken of by Dr. Symners, is always found present in the lungs in civilized life.

It is impossible, in the length of an opinion, to refer particularly to the autopsy and the evidence of the experts. Dr. Vaughan, plaintiff's expert, concedes that the man had been suffering from influenza pneumonia for a week or more. He says

" it is a typical case  *  *  *  of influenza pneumonia," and that it was well along " because it was organized."   But he infers that it was resolving pneumonia and localized, and, therefore, it would have been possible for the man to be up and around. While he says the man did not die of influenza pneumonia, we have the following questions and answers which seem to be quite conclusive:  " Q. Now, doctor, if with this report here as it is today, with the sections that you delivered to him, then the individual had a well-organized infectious pneumonia in all parts of the lungs.  A. He did not.  Q. I say if we assume that Dr. Symmers covers all sections? A. Yes, if he covered all the sections of the lungs that would be present.  Q. Then the individual had a well-organized infectious pneumonia in all parts of the lungs?  A. If he had that process in all parts of his lungs he would never have reached that far in the changes.  Q. I say if we assume that from his report on all of the sections that he had received from you, then the individual here had a well-organized infectious pneumonia in all parts of the lungs?  A. From which the specimens were removed, yes."   As he views it, the reports do not indicate any cause of the death, and he does not give an opinion as to the cause of death except the general statement that it was not due to influenza pneumonia.   Where Dr. Symmers speaks of a part of the kidney showing widespread necrotic changes and that the liver, muscle tissue and spleen show extensive necrotic changes, Dr. Vaughan says " necrotic " means death changes, but interprets the changes spoken of as changes after the death of the man.   Dr. Symmers knew that the man had been dead for days.   He was making a microscopical examination of certain parts submitted to him, and it would be idle to say that those parts were then dead when in fact all parts were dead.   Manifestly he meant by " necrotic " the death of tissue while the person was alive — " the death of a circumscribed piece of tissue " (Century Dict.) — " Mortification or gangrene" (Webster's Dict.) and that these conditions preceded the man's death.   Evidently it was safer for the plaintiff to let its expert explain what the microscopist meant than to have him present. · Dr. Vaughan concedes that the condition of the lungs, the blood clots, the pleura, as mentioned in the report, result from inflammation or infec-

tious disease. I think Dr. Schultze's testimony, taken in connection with the report of Dr. Symners and the weak explanation of it by Dr. Vaughan, completely demonstrates that the man died of acute broncho pneumonia, from influenza, or at least was so suffering from it at the time of the fire as to preclude the possibility of Ensign being the dead man. Dr. Schultze gives the only plausible cause of the death.

The plaintiff refers to the report of Dr. Gettler, her expert, made to her attorneys, where he says that a chemical examination of the blood shows that there was present a small amount of carbon monoxide and urges that it resulted from the low combustion in the wood stove or heater before the flames started, overlooking the fact that Ensign had been at the cottage since about three o'clock and presumably, at that time of year, had a fire in the wood stove from that time to bed time. It is suggested that possibly this poisonous gas caused his death and, to be consistent, that after the heater had emitted the gas it became so hot that it broke open and set the building afire. There is no dispute in the evidence that this poison has a peculiar affinity for blood. Dr. Schultze swears that in the vena cava, the largest vein of the body and which carries the blood from the body to the heart, the blood was clotted, and it was carefully examined for this chemical substance, which was found absent, but that in the blood in the roasted liver it was found in small degree where the surface was exposed; that if inhaled it would have shown in the vena cava. He swears that a portion of the clotted blood from the liver was apportioned to Dr. Vaughan, and infers that that was the blood delivered by Dr. Vaughan to Dr. Symners. Dr. Vaughan and Dr. Symners made no attempt to identify the blood in which the latter found the carbon monoxide, and, therefore, having the means of showing that Dr. Schultze was wrong, if he was, we may fairly assume that he was right. Plaintiff's failure to call Dr. Symners as a witness gives room for an inference that his evidence would not have been favorable to her. The case was tried upon the sole theory that death was caused by the burning building and not that it was an instantaneous death from carbon monoxide gas. If that was the cause of the death, the recovery could not stand except perhaps for $7,500, as the death must have

taken place before the building burned.    But it is unnecessary to discuss that question, as there is no evidence to show that Ensign met his death by that poison.    The evidence of the doctors cannot here be reproduced on account of its great length, but the more it is read on both sides the more convincing it is.    We find no substantial evidence by any one that this death was caused by the conflagration, and the plaintiff's expert ventures no suggestion as to the cause of death.    It must be evident, with the various organs in the condition as recited in this case, that this man could not, upon the day of the fire, have been around as a well man doing a full day's work and eating hearty meals; if, as the plaintiff's expert concedes, he had been suffering from influenza pneumonia for about a week, it is impossible that the man could have been abroad and at work.

We again refer to the fact that what remained of the head was found in or over a granite milk pan, of ordinary size, and that most of the head had been completely destroyed. It seems incredible that such destruction could have come from the burning of this summer cottage.    Evidently the head was subjected to a more intense and constant heat than any other part.    What was in the pan if anything before the fire does not appear; the cause of its presence and its peculiar relation to the head, and its use, can only be inferred.

Expert evidence many times is justly criticised, and where there is a disagreement by experts it may be difficult to arrive at a correct result.    But here there is no substantial, well-founded disagreement between them.    The findings of the autopsy are agreed to by all.    The plaintiff's pathologist and the defendant's pathologist, the only men who examined microscopically the stomach, lungs, kidneys, liver and spleen, agree as to their condition.    The uncontradicted evidence shows that the dead body was not that of Ensign.

The judgment should be reversed as against the evidence and a new trial granted, with costs to the appellant to abide the event.

H. T. KELLOGG, J., concurs.

Judgment and order affirmed, with costs.